Good morning. We'll call the matters as they appear on the calendar. Sarah Ortega de Pinon v. John Ashcroft, that's submitted. And now we come to Rafael Angel Camacho v. John Ashcroft. And a lot of cases where John Ashcroft's being sued. I had all those problems. I wonder what it shows on his credit report. This credit report is pretty good. No, I knew I knew a state official. And it was always named as a defendant. And then when he left, he he couldn't borrow any money because they said we ran a credit report. And there's thousands of people suing you. So you have to clean that up before we'll give you your credit card or whatever it was. OK. Ready? May it please the Court. My name is Alif Kellis, and I represent the petitioners, the Camacho family. And I'd like to inform the Court of this claim. The Camacho family entered the United States for the first time in 1985. In December of 1990, the family left for Peru to attend an immigrant visa interview at the American Embassy in Lima. To do what? To attend an interview for their immigrant visa. Oh, OK. Yeah. The embassy declined to issue them the green cards. So in April of 91, the family was able to return to the United States without inspection. In 1993, the family applied for political asylum from Peru. In 1995, the government issued a charging document referred to as an order to show cause, charging them for having overstayed their nonimmigrant visas. The family made applications for suspension of deportation. Under the prior law, persons who had been in the United States for seven or more years, had good moral character, and can establish extreme hardship, could apply for suspension of deportation before an immigration judge, and the judge could issue the person a green card. However, in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act, commonly referred to as IHRA-IHRA. IHRA-IHRA changed the rules for suspension of deportation. IHRA-IHRA had a new term called cancellation of removal, which is a higher standard for persons to meet. It requires 10 years of continuous physical presence, and requires extreme hardship on a qualifying family member. There was some confusion as to whether the new law applied to persons like the Kanasha, since they had been in deportation proceedings under the old law. Section 309C of the IHRA-IHRA dictated some transitional rules for such persons as the Kanashas, who had been in proceedings before the enactment date. Well, you know, we know all this. Yes, Your Honor. Tell us how we can help her. Okay, Your Honor. Our position is that this case is different from Ram v. INS, which was argued in both sides. The court in Ram v. INS admitted that there was ambiguity in the statute.  They felt that they had to carefully consider the legislative intent. In Ram v. INS, the court was looking at the stop time rule, whether the seven years physical presence requirement stops when the government issues the order to show cause. The court went to the legislative record, and they noted that there were several committee reports that talked about abuses in the system. Attorneys and aliens would delay and ask for continuances in order to accumulate the seven years while they were in court proceedings. For example, if they were issued an order to show cause in 95, but had entered the United States in 89, they wouldn't have the seven years. However, under the old law, you could still accumulate the seven years beyond the order to show cause date. So the court thought the Congress was trying to rectify the situation. There were a lot of abuses. The attorneys and the aliens consistently asked for continuances from the immigration judges just so that they could accumulate the seven years. In fact, in Ram v. INS, the aliens only had one year of presence before their orders to show cause were issued. They entered in 87, and their orders to show cause was issued in 88. So they accumulated the seven years after they arrived in the United States. Pardon me if I was wrong, but after their orders to show causes were issued. In our case, we contend that there was no abuse by the Camachos. In our case, their attorney did seek several continuances. And as far as the calculation, I believe the attorney was out of the country during one hearing. She was attending a hearing or a hearing. Can I interrupt for just a minute? I'm willing to assume for purposes of this question that the continuances, and there were several in this case, were beyond the control of the Camachos and were not asked for for any strategic reason. So let's assume that that's true for the purpose of this question. Nonetheless, how does that help you get around the rule that we held is the rule in Ram? That is to say, you know, sometimes you get abuses that produce a rule, and then the rule sweeps within it cases that are abuses and cases that aren't abuses. So how do we get around the Ram rule? Well, Your Honor, in reading the transitional rules, 309C2 conflicts with 309C5. 309C2 specifically says that the attorney general, if the attorney general opts to elect to apply the new law to aliens like the Camachos, then the attorney general shall provide notice of such election to the alien involved not later than 30 days before the date any evidentiary hearing is commenced. There was no such notice here. This is in conflict with 309C5, which doesn't state anything about warning the alien that the new law is going to apply. There has to be some sort of meshing. The whole statute has to be read together. 309C5A was taken out of context and not read together with 309C2. There has to be fair notice and due process. The alien has to be notified that the new law is going to apply to them. Well, there was no question that the attorney general was applying the new law to you. I mean, that's a given. However, it had to be 30 days before any evidentiary hearing. And in this case, the judge made a decision in 1999 to say, well, I believe 309C5A applies to this case. And that was that. There was no evidentiary hearing. There was no 30-day warning. Your claim is that in order to apply the transitional rules in IRAIRA, you had to have 30 days' notice prior to the hearing. Yes, Your Honor. That those rules would be applied. Absolutely, Your Honor. That's how I read 309C2. Otherwise, the attorney general never has to use this fair notice. Well, I take it, if that's your position, the attorney general even today could give you 30 days' notice and proceed anew, could he not? That's correct, Your Honor. And apply IRAIRA and transitional rules. That's correct. Let me ask you one other question. You don't claim that any of these adjournments that occurred prior to the actual matter coming on before the immigration judge were contrived by the government or anything like that, do you? Not by the government, Your Honor. In other words, there's no bad faith in the government in, in effect, moving this case into the new law when it could have been, when you could have been home free under the old law. Not on behalf of the government, Your Honor. There was no bad faith. We were not arguing that. I see. All right. I don't want to eat too much into your rebuttal time, but maybe we'll be sort of forgiving at the far end here. But I have another question, and that is, assuming that the old rules rather than the new post-IRAIRA rules apply, do you need to show that that absence in Peru was brief, casual, and innocent? Yes, Your Honor. What you're just trying to get around is the sort of the flat 90-day rule that's the new rule. Absolutely, Your Honor. Okay. Now, given that, how do you deal with the statements in the application that are at page 366 and 369 of the administrative record, from which I think at least a plausible reading tells us that they didn't go back there merely to get a green card. They don't mention a green card at all. They went back there to try living back in Peru because the wife so much missed the old country. How do you get around that? If that's so, how can that then be a brief, casual, and innocent departure? Yes, Your Honor. Within the meaning of the old rule. Your Honor, the wife could have had her own reasons for returning to Peru. But during the hearing, Mr. Camacho said that they did attend an immigrant visa interview. And I should probably make the Court aware, we had filed a motion to reopen with the BIA, and last week that motion for the younger Petitioner, Rosa Camacho, the daughter, was denied. Was denied. Okay. Did you argue this 90-day notice, this notice before the immigration judge? I'm sorry, Your Honor? Your presentation here is saying that you had to have notice that Ira Ira is going  Did you argue that before the immigration judge? I don't believe so. Well, then how is it before us? We can't hear matters which were way before. If you would have argued before the immigration judge, the immigrant I'm sure the government, if I follow their usual practice, would have said if that's any problem, we'll adjourn the proceeding for a couple of months to give you the notice and come back on for the hearing. You're arguing something here that you didn't brief it either. Was that the brief? No, Your Honor. We did argue that 309C5A does not apply to the Camachos. Because they had made application earlier. But you did not argue that it couldn't be applied to them because they weren't given the 30-day notice. No, Your Honor. So how can we consider that on appeal? We don't hear matters on appeal that weren't in the record before the trial court. The issue of the entire issue in this case is whether the transitional rules apply to the Camachos. And then if they do, how does the transitional rule affect their suspension of deportation case? So in that context, all of 309A, B, C has to be read. Yes, but as a defense to applying IRA-IRA and the new transitional rules, you claim before us that you weren't given this notice. But you never argued that before the immigration judge, nor did you argue it in your brief. It's a new argument. It's perhaps a new argument, but still it comes within the gambit of 309C5A doesn't apply to the clients because they were issued the orders to show cause before this effective date. Well, that may or may not be true, but it's not jurisdictional for the action that the immigration judge took. And how can we reach something which you did not have as a defense before the immigration judge? And as I mentioned, my experience is if you would have raised something like that, the government would ask for an adjournment and given you the notice and come back a couple months later and you would have had no defense. In all defense of the prior counsel that represented the Camachos during their hearing before an immigration judge, things happen very, very quickly in immigration court. Judges are very likely to move cases along as quickly as possible. Their dockets are very full. They get impatient. They make a ruling and will not consider any arguments unless perhaps a motion to reopen or reconsider is submitted later. I'm not exactly certain why this issue was not brought up by the prior counsel, but I do have a slightly different topic. The 245 capital AD2 section, which deals with continuous physical presence, should not be the sole determination of whether someone has maintained their residence in the United States. That section just says that an alien shall be considered to have failed to maintain physical presence if they've been out for more than 90 days or an aggregate of 180. However, there have been instances where persons have left the United States under a threat of deportation and have come back before the 90 days, but still they've determined to have failed to maintain physical presence, even though it comes outside of this particular section. There are other ways to look at continuous physical presence outside this section. Thank you. There was a request for repapering that was made here? Yes, Your Honor. And what's the status of that? The PIA denied that request. Denied that request. Last week. Thank you. Good morning. May it please the Court. My name is Jacqueline Dryden, and I represent the Attorney General of the United States. This is an immigration case in which the immigration judge properly applied Section 240AD2 to find that the Camachos' five-month departure to Peru constituted a break in their continuous physical presence, thereby rendering them ineligible for relief in the form of suspension of deportation. Contrary to the Camachos' assertions, this case is controlled by this Court's discussion in RAM v. INS. There is no ambiguity as to what this Court said in RAM v. INS, and that holding should be applied to the instant case. In RAM, this Court held that there's only one reasonable interpretation of Section 309C5A. That is that it applies to transitional rural aliens who have been issued orders to show cause and who are seeking relief in the form of suspension of deportation. By its plain language, Section 309C5A applies both to termination of the continuous period and also as to treatment and breaks of continuous physical presence. The Court … Can I ask you something? Yes, Your Honor. Did the BIA give any reasons for denying the repapering request? Your Honor, I don't … I am not aware … I just found out earlier this morning that the Board actually did deny the repapering request, so I don't know the explanation for that. I haven't received any papers regarding that. Well, it's totally discretionary with the … totally discretionary matter, isn't it? Well, to even repaper in the first instance, as the Third Circuit found in Roas Reyes, the AG's determination whether or not to repaper a matter is at the Attorney General's discretion. Well, we know that. I just wondered if any reason was given. Not that I'm aware of, Your Honor. As far as when the Camachos were seeking continuances, the government will not go so far as to say that they were seeking to delay their proceedings. However, five of the seven continuances that took place during the immigration court proceedings were at the behest of the Camachos. Three of those were due to their former attorney's unavailability, either because of hospitalization or because she was out of the country. However, two of those were to determine, were requested, citing the fact that they had a labor certification pending with the INS, and they were waiting for a decision on that matter. And I think that even took place over a year-and-a-half to two-year period. So I don't know to say that they were delaying their proceedings. I wouldn't go so far as that. But there is some indication that they were waiting for something else before they received a final deportation order. Regarding the Castrillon-Garcia case, the government submits that that case is not applicable to the matter at hand. Section 240A2D, regarding the termination of certain breaks in presence, stands on its own. And Ms. Kaur and Vasquez-Lopez, I believe is the name of the case, did look at someone who was granted voluntary departure and returned to the United States and said it didn't necessarily fall under 240A2D2. But that was an exception. And that was only after looking at whether or not 248D2 applied in the first instance. I'll take any questions that Your Honors may have for me. Thank you very much. Thank you. Just a small summation. The government respectfully requests that this Court dismiss this petition for review. The Camachos' five-month departure to Peru constituted a break in their continuous physical presence as set forth in 240AD2, thereby rendering them ineligible for suspension of deportation. Moreover, the Camachos did not approve seven years' continuous physical presence after the issuance of the Order to Show Cause in 1995, and therefore they cannot satisfy the seven-year requirement required for suspension of deportation on that basis. Thank you. Thank you. Any rebuttal? I'll take the motion. Thank you. Thank you. The matter is submitted. And next matter, Roberto Zepeda-Garabay v. Ashcroft. That's submitted.
judges: Pregerson, Cowen , W. Fletcher